# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS ROBERTS and<br>DIANE ROBERTS,<br><br>   Plaintiffs,<br><br> v.<br><br>ALEXANDRIA TRANSPORTATION, INC.,<br>*et al.*,<br><br>   Defendants.<br>_____<br><br>ALEXANDRIA TRANSPORTATION, INC.,<br>*et al.*,<br>   Third-Party Plaintiffs,<br><br>vs.<br><br>STATEWIDE TIRE DISTRIBUTORS, INC.,<br>*et al.*,<br>   Third-Party Defendants. | Case No. 3:14-cv-01063-JPG-SCW |

## **MEMORANDUM & ORDER**

   This matter comes before the Court on two motions. The first is a motion for summary judgment filed by third-party defendant Safety International, LLC on the third-party complaint in this case. (Doc. 234.) The second is Safety International, LLC's motion to exclude the opinions of two of the third-party plaintiffs' expert witnesses. (Doc. 239.) The Court held oral arguments on both motions on January 4, 2018. At the conclusion of the hearing, the Court granted in part and denied in part the motion to exclude and explained its full rationale for doing so on the record. The Court took the motion for summary judgment under advisement. Now, for the following reasons, the Court **DENIES** the motion for summary judgment.

1

## I. BACKGROUND

One day in 2013, plaintiff Thomas Roberts was driving his truck on I-70 westbound in Madison County, Illinois. When Roberts entered a construction zone—one he had been aware of for several weeks because of his regular travel through the area—the lanes merged from two to one. (Thomas Roberts Dep., Doc. 241-1, pp. 56–57.) Roberts did not see a sign indicating that a flagger was ahead, but he spotted a flagger anyways at a distance of around 100 yards. The flagger was holding a sign that said "SLOW", so Roberts slowed down from 45 MPH to some unspecified slower speed. (*Id.* at 66–67.) When Roberts was about 50 yards from the flagger, the flagger abruptly flipped the sign around to "STOP"—even though there were no trucks entering or leaving the site, no vehicles in the open lane on the other side of the flagger, and the flagger did not appear to be communicating with anyone. The flagger also failed to raise his other hand to indicate the stop, as required by law. Regardless, Roberts slammed on the brakes and came to a quick stop merely 12 yards from the flagger. (*Id.* at 74–75.)

Defendant Alexandre Solomakha had been driving a freightliner behind Roberts for about two miles before the stop. The distance between the two vehicles was around one-and-a-half freightliners. (Alexandre Solomakha Dep., Doc. 241-2, p. 113.) Solomakha also never saw a "flagger ahead" sign, but he did see the flagger haphazardly playing with the sign by flipping it back and forth. (*Id.* at 117.) When Solomakha noticed that Roberts started to slow down, Solomakha slowed down too. But when Roberts slammed on his brakes, Solomakha was not able to stop his freightliner in time. Though the freightliner had slowed dramatically and was almost completely stopped at the time of the impact, it still rear-ended Roberts. (*Id.* at 122–23, 129.)

Following the crash, Roberts sued Solomakha in this Court for negligence stemming from the crash. Roberts also sued several more defendants, including Alexandria

Transportation—which is owned by Solomakha—and Alex Express, LLC: the company that Solomakha was delivering freight for at the time of the accident. Roberts's wife Diane joined in the suit on a loss of consortium theory.

Solomakha, Alexandria Transportation, and Alex Express then brought a third party-complaint against several third-party defendants for their role in failing to maintain the safety of the construction site, on the theory that if Solomakha/Alexandria Transportation/Alex Express are liable to plaintiff Roberts in negligence for the crash, then the third-party defendants are also liable as joint tortfeasors because they failed their duty to keep the construction site safe for the general public to drive through. One of those third-party defendants is Safety International, LLC ("Safety"). The general contractor for the site, Edwards-Kamadulski, LLC ("Edwards"), retained Safety via an oral agreement to be responsible for, well, safety issues at the construction site.

That oral agreement is what complicates this case. Safety claims that their responsibilities under the oral agreement are clear: Safety was only responsible for employee safety compliance and training at the worksite. They were to effectuate this responsibility by developing a compliance plan to be implemented by Edwards and their subcontractors, as well as providing a small amount of Occupational Health and Safety Administration (OSHA) training with the supervisors and project foremen at the site. Safety is a small shop—made up of only two people—and Safety argues that they never provide services to anyone other than this routine safety consulting.

Solomakha, Alexandria Transportation, and Alex Express vehemently disagree with Safety's interpretation of the oral contract. They argue that Safety had a duty to the general public—not just employees at the site—to exercise reasonable care in the operation, maintenance, management, and inspection of the site. Under this interpretation, Safety's duty

extends to training the flaggers responsible for directing public traffic through the construction zone. Since Safety has admitted that they did not provide any traffic control services to Edwards, and the flagger was an employee of Edwards (Kevin Edwards Dep., Doc. 241-5, p. 61), the third-party plaintiffs believe that Safety categorically failed to carry out their contractual duties and should be liable as a joint tortfeasor.

## II. LEGAL STANDARDS

### i. *Summary Judgment*

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter

4

summary judgment for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts". *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

### ii. Negligence

Since this action is rooted in diversity jurisdiction, Illinois tort law governs: a federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). In order to state a cause of action for negligence under Illinois law, the plaintiff must show that: "(1) the defendant owed him a duty of care; (2) the defendant breached that duty; and (3) the breach was the proximate cause of his injuries." *Staples v. Krack Corp.*, 186 F.3d 977, 979 (7th Cir. 1999) (citing *Ward v. Kmart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990)). Where, as here, the negligence action is based on a contractual obligation, the scope of the duty is determined by the terms of the contract. *See Melchers v. Total Electric Constr.*, 723 N.E.2d 815, 818 (Ill. App. Ct. 1999). The terms of a contract are an issue of fact for the fact-finder—here, a jury—to decide. *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 848 (7th Cir. 1998). If the terms are ambiguous, the Court may allow the parties to

introduce extrinsic evidence to help the fact-finder properly interpret the contract. *Kurti v. Fox Valley Radiologists, Ltd.*, 464 N.E.2d 1219, 1226 (1984).

## III. ANALYSIS

This case is about whether the oral contract between Safety and Edwards imposed a duty on Safety to train the traffic flaggers at the construction site to safely guide passing traffic through the area. Safety claims that the contract did not place such a duty on them. Safety asserts that Edwards hired Safety "solely to ensure the safety of Edwards-Kamadulski's employees regarding on the job injuries, Edwards-Kamadulski's compliance with OSHA regulations, and to provide accident investigation services should an Edward's Kamadulski [sic] employee be injured on the job." (Doc. 235, p. 6.) Kevin Edwards, a managing member of Edwards, testified in his deposition that this responsibility did not extend to designing traffic control or training and supervising flaggers. (Kevin Edwards Dep., Doc. 241-5, p. 81:3–11.) Safety was also to "provide a written Site Specific Safety Plan" (the "Plan") to the Illinois Department of Transportation (IDOT) for the project. *Id.* Safety argues that the Plan—a piece of extrinsic evidence—further illuminates the terms of the oral contract and shows that Safety was not responsible for traffic control at the construction site.

Unfortunately for Safety, the third-party plaintiffs have commandeered the Plan and captained it to sink Safety's motion into a dark, murky sea of disputed material facts. The question is simple: does the Plan—a piece of extrinsic evidence—show that Safety was responsible for more than just drafting a safety plan to be implemented by the general contractor and providing a sparse amount of safety training to the general contractor's employees? The answer is not simple: at this stage in the proceedings, we do not know. What we do know is that a genuine dispute of material fact as to the terms of the contract exists, and when viewing these

facts in the light most favorable to the non-moving party (the third-party plaintiffs), summary judgment is not warranted.

The Plan is relatively straightforward. Safety's president, Michael Sicking, drafted the eight-page Plan and submitted it to IDOT. (Michael Sicking Dep., Doc. 241-7, pp. 16–17.) On the first page of the Plan, Sicking titles himself as the "Safety Director" for the site and states that he will be "the primary safety contact for this project to help assist in day-to-day safety issues". (Site Specific Safety Plan, Doc. 241-6, p. 1.) In the "Medical Services and First-Aid" provision of the Plan, Sicking even listed himself under the "trained personnel on site" section as being a Red Cross Certified Instructor in first aid and CPR, available as a "trained and designated first aid responder available on site". (*Id.* at 2.)

This is problematic for Safety. If their duty here was to simply draft a safety compliance plan, submit it to IDOT, and provide a sparse amount of OSHA training to the employees of Edwards, then why did Sicking list himself as the overarching "Safety Director" for the site that will be the primary contact to help with "day-to-day issues"? Does this provision mean that Sicking had supervisory authority over the flagger in this case? And why would Sicking be available as a trained and designated first-aid responder available on the site if he was not meant to be more deeply involved at the site? These questions indicate that Sicking could have been responsible for more than what Safety has argued at this juncture.

Next, the Plan delineates a number of "site specific safety requirements". (*Id.* at 2.) This section starts by discussing personal protective equipment: head protection, hearing protection, traffic safety vests, and the like. (*Id.* at 2–3.) Safety admitted at oral argument that they had a responsibility to ensure that the Edwards employees were complying with these safety

provisions. But unfortunately for Safety, there is a provision at the end of this section that wrecks their motion:

> **Traffic Control Plan**
>
> Traffic Control shall be in accordance with the applicable sections of the "Standard Specifications for the Road & Bridge Construction," the applicable guidelines contained in the National Manual on Uniform Traffic Control Devices for Streets and Highways, Illinois Supplement to the National Manual of Uniform Traffic Control Devices, these special provisions, and any special details and highway standards contained herein and in the plans.

(*Id.* at 3–4.) This provision is critical because the referenced National Manual on Uniform Traffic Control Devices (the "Manual")—the Federal Highway Administration's uniform standards for traffic control devices on any public highway—contains regulations on flaggers in construction zones:

> **Section 6E.01 Qualifications for Flaggers**
>
> Guidance:
>
> 01 Because flaggers are responsible for public safety and make the greatest number of contacts with the public of all highway workers, they should be trained in safe traffic control practices and public contact techniques. Flaggers should be able to satisfactorily demonstrate the following abilities:
>
> A. Ability to receive and communicate specific instructions clearly, firmly, and courteously;
> B. Ability to move and maneuver quickly in order to avoid danger from errant vehicles;
> C. Ability to control signaling devices (such as paddles and flags) in order to provide clear and positive guidance to drivers approaching a TTC zone in frequently changing situations;
> D. Ability to understand and apply safe traffic control practices, sometimes in stressful or emergency situations; and
> E. Ability to recognize dangerous traffic situations and warn workers in sufficient time to avoid injury.

U.S. Dep't of Transp., Fed. Highway Admin., *Manual on Uniform Traffic Control Devices* (2009), https://mutcd.fhwa.dot.gov/pdfs/2009r1r2/mutcd2009r1r2edition.pdf; *see also* 23 C.F.R. § 655.603(a).

If Safety was only responsible for drafting the Plan and providing small amounts of OSHA compliance training, then what is the purpose of this "Traffic Control Plan" provision? Safety argues that the oral contract made Edwards responsible for implementing this traffic provision, not Safety. But just as with Safety's previous argument, this presents a genuine dispute of material fact as to the terms of the oral contract. The dispute becomes even murkier when you consider that Safety admitted at oral argument that they were responsible for other provisions in the "site specific safety requirements" section, such as ensuring that Edwards employees were wearing headwear and traffic vests. Why would Safety be responsible for all of the provisions in the safety requirements section other than the traffic control plan? As previously mentioned, Edwards has claimed that Safety's responsibility under the oral agreement did not extend to designing traffic control or training and supervising flaggers (Kevin Edwards Dep., Doc. 241-5, p. 81:3–11), but this claim seems to directly contradict the plain language of the Plan.

Finally, The Plan requires all Edwards employees to adhere to "all applicable OSHA regulations". (Site Specific Safety Plan, Doc. 241-6, p. 1.) And Safety has admitted that they were responsible for some degree of OSHA safety compliance and training. (Safety Mot. for SJ, Doc. 234, ¶¶ 4–5.) But OSHA regulation § 1926.201(a) states that "signaling by flaggers and the use of flaggers ... shall conform to the Manual on Uniform Traffic Control Devices . . . ." 29 C.F.R. § 1926.201(a). This thread implies that Safety may have been responsible for complying with the above-quoted 6E.01 "Qualifications for Flaggers" provision of the Manual via OSHA

regulation § 1926.201(a). Once again, the scope of Safety's responsibilities under the oral contract are entirely unclear at this stage in the proceedings.

This case may be the blueprint for why parties should put contracts in writing. Since we do not have a written contract here, the Plan gives us some hints as to what the oral contract may have extended to. But the Court cannot rely on hints when resolving a genuine dispute of material fact. That task is one for a jury.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Safety's motion for summary judgment. (Doc. 234.)

**IT IS SO ORDERED.**

**DATED: JANUARY 18, 2018**

s/ *J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
